**KAPLAN FOX & KILSHEIMER LLP**
Justin B. Farar (SBN 211556)
12400 Wilshire Boulevard, Suite 910
Los Angeles, CA 90025
Telephone: 310-614-7260
Facsimile: 310-614-7260
Email: *jfarar@kaplanfox.com*

**KAPLAN FOX & KILSHEIMER LLP**
Laurence D. King (SBN 206423)
Matthew B. George (SBN 239322)
Blair E. Reed (SBN 316791)
Sophia V. Pintar (SBN 367193)
1999 Harrison Street, Suite 1501
Oakland, CA 94612
Telephone: 415-772-4700
Facsimile: 415-772-4707
Email: *lking@kaplanfox.com*
*mgeorge@kaplanfox.com*
*breed@kaplanfox.com*
*spintar@kaplanfox.com*

*Attorneys for Plaintiffs Caryn Hart, Clare Erslev, Anise Ivey, and the Proposed Class*

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

**WESTERN DIVISION**

| | |
|---|---|
| CARYN HART, CLARE ERSLEV, and ANISE IVEY, individually, and on behalf of all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>NIAGEN BIOSCIENCE, INC. and CHROMADEX, INC.,<br><br>Defendants. | Case No. 26-cv-06647<br><br>**CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

Plaintiffs Caryn Hart, Clare Erslev, and Anise Ivey ("Plaintiffs"), individually, and on behalf of all others similarly situated, by and through undersigned counsel, bring this class action against Defendants Niagen Bioscience Inc., and ChromaDex Inc. ("Defendants") and complain and allege upon personal knowledge as to themselves and upon information and belief as to all other matters.

## NATURE OF THE ACTION

1. This is a class action brought on behalf of consumers who purchased Defendants' Tru Niagen nicotinamide riboside ("NR") dietary supplements (the "Products").

2. "Snake oil" salesmen scams are some of the oldest tricks in the book. Exploitative scammers and businesses sell "cure all" products that prey on the anxieties of vulnerable consumers. Defendants' Products are the newest iteration of this age-old scheme and promise youthful vitality through its Products.

3. Defendants are capitalizing on the newest health movement, "bio-hacking," which is the practice of using diet, health data tracking, and supplements to increase one's maximum lifespan and longevity in order to sell the Products and exploit vulnerable consumers' anxieties about their health declining as they age.[1]

4. One of the hottest new trends promulgated by bio-hackers is seeking to increase their levels of nicotinamide adenine dinucleotide ("NAD+"), a vital coenzyme found in the body's cells that help the body convert food into energy and repair our cellular DNA.

5. As we age, our bodies' NAD+ levels decline, which makes it harder for the body to produce energy, and contributes to the changes associated with aging like muscle loss and metabolic decline. Consumers thus seek to fill this gap in their NAD+ levels and thus improve these health conditions.

---

[1] https://dontdie.bryanjohnson.com/ (last visited June 9, 2026).

6. Defendants' marketing campaign for the Products centers around the claim that the Products are "clinically proven" to significantly increase NAD+ levels and claim that the Products provide support for anti-aging, vitality, cognitive health, cardiovascular health, immune health, muscle recovery, cellular repair, and energy-improving benefits.




7. The Products are sold online and in stores throughout the United States, including at mass retailers such as Amazon.com, Walmart, Target, and Sprouts Farmers Market.

8. Defendants charge a premium price of approximately $50 per 30 count bottle and suggest a dose of one pill per day.[2] The Products come in additional bottles of 90 and 180 pills that retail for approximately $127.00 and $244.00 respectively.[3] Defendants also sell the Products in various doses of 150mg, 300mg, and 1,000mg.[4]

---

2 https://www.truniagen.com/products/tru-niagen-300mg?v

3 *Id.*

4 https://www.truniagen.com/collections

9. Indeed, Defendants have ridden this NAD+ trend by advertising the Products through their own website, digital advertising, and various social media and influencer campaigns to promote the Products as anti-aging supplements.[5]

10. However, an independent review conducted by the National Advertising Division shows that Defendants misrepresent the science behind the Products and the purported benefits they advertise providing to consumers.

11. Specifically, Defendants' advertising claims that the Products are "clinically proven" to increase NAD+ levels within two weeks of daily use, and that the Products provide actual benefits for anti-aging, cellular repair, and organ health, among other claims.

12. By stating in their marketing that the Products are "clinically proven" to provide these benefits, Defendants overstate and misrepresent clinical findings about the Products and their health benefits and falsely represent to the ordinary consumer that the Products have been proven through rigorous scientific testing to actually provide these health outcomes.

13. Defendants' false and deceptive advertising form a pattern of unlawful and unfair business practices that harm the public and violate consumer protection laws.

14. Indeed, a reasonable consumer would understand from Defendants' representations that the Products were "clinically proven" to show actual, functional health outcomes. In reality, studies done on NR supplementation (the active ingredient in the Products) show that it will only increase NAD+ levels under certain conditions, depending on various factors like study design, population, and conditions of use.[6]

---

[5] https://www.truniagen.com/products/tru-niagen-300mg; https://digitaleverything.consulting/client/nutraceutical-supplement-brand/ (last visited June 8, 2026).

[6] https://bbbprograms.org/media/newsroom/decisions/niagen (last visited June 11, 2026).

15. Despite the lack of scientific evidence, Defendants mislead reasonable consumers with scientific and clinical claims that the Products are proven to repair cells, improve energy production, and provide anti-aging benefits, even without the backing studies that have shown the active ingredient in their Products can provide the claimed health benefits.

16. Had Plaintiffs and consumers known that the Products were not in fact "clinically proven" to provide these benefits as Defendants represent, they would not have purchased the Products, or at the very least, would have paid substantially less for them.

17. Through this suit, Plaintiffs seek to halt Defendants' unlawful sales and marketing of their Products and obtain damages they sustained as a result of the illegal sales and false and misleading marketing.

## PARTIES

18. Plaintiff Caryn Hart is a citizen of California and resides in Encinitas, California. Plaintiff last purchased Tru Niagen 300mg 30 ct. from Sprouts Farmers Market in Encinitas, California in May 2026 for $44.99 plus tax.

19. Plaintiff Clare Erslev is a citizen of Maryland and resides in Silver Spring, Maryland. Plaintiff last purchased Tru Niagen 300mg 90 ct. in Silver Spring, Maryland directly from Defendants' website in September 2025 for $101.60.

20. Plaintiff Anise Ivey is a citizen of Arizona and resides in Mesa, Arizona. Plaintiff last purchased Tru Niagen 300mg. 30 ct. in Mesa, Arizona from Amazon.com in November 2025 for $40.20.

21. Defendant Niagen Bioscience, Inc. is a Delaware corporation with headquarters in 10900 Wilshire Blvd., Suite 600 Los Angeles, California 90024. Defendant Niagen Bioscience manufactures, markets, distributes, advertises, and sells the Products in the United States, including in California and in this District, through brick-and-mortar stores and throughout numerous retailers online.

22. Defendant ChromaDex, Inc. is a California Corporation with its headquarters at 10900 Wilshire Blvd., Suite 600 Los Angeles, California 90024. Defendant licenses, markets, distributes, advertises, and sells the Products in the United States, including in California and this District, through brick-and-mortar stores and throughout numerous retailers online.

## JURISDICTION AND VENUE

23. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1332, as amended by the Class Action Fairness Act of 2005, because the matter in controversy exceeds $5,000,000, exclusive of interest and costs, and is a class action in which some members of the Class are citizens of different states than the Defendants. *See* 28 U.S.C. § 1332(d)(2)(A). This Court has supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367. This Court has personal jurisdiction over Defendants because they are authorized to do business and conduct business in California, maintain headquarters in California, have specifically marketed and sold their products and services in California, and have sufficient minimum contacts with this state and/or sufficiently avail themselves of the markets of this state to render the exercise of jurisdiction by this Court permissible.

24. Venue in this Court is proper pursuant to 28 U.S.C. § 1391 because a substantial part of the events giving rise to the claims asserted herein occurred in this District and Defendants are subject to personal jurisdiction to the federal court in this District. Moreover, Defendants maintain their corporate headquarters in this District and/or may be found in this judicial district and the interstate trade and commerce described herein is and has been carried out in part within this judicial district.

/ / /

/ / /

/ / /

/ / /

## FACTUAL ALLEGATIONS

### A. NAD+ Supplements and Defendants' Products

25. NAD+ is a coenzyme found in every cell in the body. The body needs NAD+ to convert food into energy, regulate gene activity, and coordinate the body's stress and immune responses.

26. As people age, their NAD+ levels steadily decline, which makes the body less efficient at making energy and repairing cellular damage accumulated overtime from lifestyle factors like alcohol consumption, stress and sedentary lifestyle.[7] Lower NAD+ levels have been linked to various age-related changes, such as muscle loss and fatigue, metabolic issues and cognitive decline, among others.[8]

27. NAD+ is hard to absorb in supplement form, so supplements typically claim to include ingredients that fuel NAD+ production, so the body can create NAD+ molecules on its own.

28. One of those ingredients is nicotinamide riboside ("NR"). NR is the active ingredient in the Products and other NAD+ supplements. Defendants market NR as a "precursor," which substances the body uses to make NAD+ on its own.[9] Thus, Defendants claim that taking the prescribed supplement every day will provide the building blocks the body needs to produce more NAD+ levels (and thereby counteract aging).

29. While many NAD+ supplements, including Defendants' Products, claim that their supplement will increase NAD+ levels, research on NAD+ supplements and their various health benefits is still developing. Researchers are still

---

[7] https://health.clevelandclinic.org/nad-supplement (last visited June 10, 2026).

[8] https://my.clevelandclinic.org/health/body/nad-nicotinamide-adenine-dinucleotide (last visited June 10, 2026).

[9] https://health.clevelandclinic.org/nad-supplement (last visited June 10, 2026).

investigating all of the long-term benefits and risks associated with taking NAD+ supplements. Currently, the total research is limited or inconclusive at best.[10]

30. Doctors and health researchers recommend that the best ways to increase one's NAD+ levels are through diet and exercise changes, such as increasing daily physical activity, eating a nutrient-rich diet, and managing daily stress.[11]

**B. The Anti-Aging and Bio-Hacking Supplement Market**

31. Over the past decades, the supplement market has grown exponentially, increasing from 4,000 products available in 1994 to as many as 95,000 available in 2024.[12]

32. The fast-growing trend of preventative health measures and self-optimization, popularized by celebrities and health influencers like Andrew Huberman, Bryan Johnson, and Gary Brecka, has created a boon for supplement companies that promote anti-aging and cellular metabolism products.[13]

33. The bio-hacking and health data tracking market has also exploded in recent years, with the increased popularity of wearable trackers and watches, genetic testing kits, and health apps that monitor health markers, including one's biological and metabolic age.

34. An important aspect of these health trends is adding an extensive supplement routine to increase levels of specific vitamins and nutrients that fill the

---

[10] *Id.*

[11] https://my.clevelandclinic.org/health/body/nad-nicotinamide-adenine-dinucleotide (last visited June 10, 2026).

[12] https://journalofethics.ama-assn.org/article/which-features-dietary-supplement-industry-product-trends-and-regulation; https://pmc.ncbi.nlm.nih.gov/articles/PMC11382137/ (last visited June 12, 2026).

[13] https://www.nytimes.com/2026/05/23/well/nad-longevity-supplement-antiaging.html (last visited June 12, 2026)

gaps in an average diet and combat factors associated with aging like focus, stress, sleep and other factors that impact health and longevity.[14]

35. Consumers are increasingly seeking supplements that are marketed as capable of improving cellular health, increasing cellular energy production, and expanding one's lifespan.

36. This has led to a boom in the NAD+ supplement market, which was valued at $252 million in 2024 and projected to reach $884 million by 2034.[15] Leaders in these health movements tout NAD+ supplements as a vital health intervention to prevent aging and optimize mental and physical performance as people get older.[16]

37. Consumers place significant weight on representations that a product is "clinically proven" to achieve something, or that the claims about a product are backed by science. This is especially true for consumers of a product like NAD+ supplements, as they are looking for a product to help them meet their medical or wellness goals.

38. Consumers are even more susceptible to representations that a product is backed by scientific or clinical studies because concerns regarding vitality, aging and long-term health are deeply personal. As a result, consumers are willing to pay more if they believe a product is the highest quality on the market and backed by actual science.

39. Accordingly, Defendants are aware that consumers are willing to pay a premium for products that claim they are "clinically proven" to work and that their benefits are scientifically proven.

---

[14] https://biogena.com/en/knowledge/blog/biohacking-supplements (last visited June 10, 2026).

[15] https://www.insightaceanalytic.com/report/nad-based-anti-aging-market-size-share--trends-analysis-report (last visited June 12, 2026).

[16] https://www.nad.com/news/andrew-hubermans-updated-supplement-stack-for-2026. (last visited June 10, 2026)

40. Defendants have profited greatly from consumer demand for NAD+ and longevity products, and touted in 2024 to have sold over 8 million units of the Products globally.[17]

**C. Defendants Made False and Misleading Representations**

41. In order to induce purchases, Defendants crafted a consistent and uniform marketing campaign across their labeling, packaging, subscription programs, testimonials, social media and influencer campaigns and digital advertising.[18]




[17] https://www.truniagen.com/blogs/tru-niagen-labs/navigating-nr-nmn-and-other-nad-precursors-to-find-the-best-nad-supplement (last visited June 10, 2026).

[18] https://digitaleverything.consulting/client/nutraceutical-supplement-brand/ (last visited June 8, 2026).


MEET OUR STAR SUPERNUTRIENT

The #1 NAD+ booster[3]

Discover Tru Niagen, a revolutionary supplement backed by decades of research and clinically proven to increase NAD+ up to 150% to keep your cells performing at their best.

Powered by Niagen®, our patented form of nicotinamide riboside, Tru Niagen is one of the most well-researched, efficient, and superior NAD+ precursors available, ensuring you get the best for your health.

42. Defendants marketed the Products as capable of increasing NAD+ levels and "clinically proven" to provide a broad range of health benefits, including, among other claims, that the Products "support[] heart health," "support[] brain health," broader vitality and anti-aging claims, and claims framed at the cellular level (*e.g.*, "supports cellular energy that your heart cells need").[19]

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

[19] https://bbbprograms.org/media/newsroom/decisions/niagen (last visited June 11, 2026).







43. Specifically, Defendants represented that the Products are "clinically proven to significantly increase NAD+ levels, and help maintain them with daily use," that the Products would show significant increases after two weeks of use, and additional claims linking increased NAD+ levels to a range of health-related benefits.[20]

/ / /

/ / /

/ / /

---

20 https://www.truniagen.com/products/tru-niagen-300mg; https://bbbprograms.org/media/newsroom/decisions/niagen (last visited June 12, 2026).

### How to Use

- Adults can take one capsule 1-3 times daily as needed or as recommended by your healthcare professional.
- Tru Niagen is meant to be taken daily. 300mg is clinically proven to increase NAD+ levels by over 50%.
- Depending on your lifestyle, stressors, and diet, you can further supplement with Tru Niagen by adding an additional capsule.
- Tru Niagen is safe to consume up to 2,000mg/day.

44. Indeed, before consumers are able to purchase the Products on Defendants' website, they see the same claims Defendants have touted on social media through other advertising: that the Products are "clinically proven" to increase NAD+ levels and support various health issues and provide anti-aging benefits.




45. Defendants' marketing campaign conveyed to reasonable consumers that the Products had demonstrated meaningful results in broad, substantiated clinical testing to increase these biomarkers and provide actual health benefits to all consumers.

46. On their Amazon page, Defendants repeat the claims that the Products are "clinically proven to be one of the safest and most efficient boosters of NAD+ levels" and that their Products can increase NAD+ levels by over 50% in just 2 weeks.



**Top highlights**

| | |
|---|---|
| **Brand** | TRU NIAGEN |
| **Flavor** | Unflavored |
| **Primary Supplement Type** | Patented NAD Supplement, Vitamin B3 |
| **Unit Count** | 60 Count |
| **Item Form** | Capsule |

See more

**About this item**

- A COMPLETE ANTI AGING SUPPLEMENT - Support whole body wellness and boost cellular energy with Tru Niagen, a patented NAD+ supplement that supports the 37.2 trillion cells in your body Tru Niagen helps the production of nicotinamide adenine dinucleotide to promote healthy cell activity and can help reduce aging-related health concerns. Tru Niagen is clinically proven to be one of the safest and most efficient boosters of NAD+ levels, shown to increase NAD+ over 50% in just 2 weeks with daily use.
- VITAL FOR CELLULAR ENERGY - Tru Niagen supports your ability to stay healthy by boosting NAD+ levels, which naturally decline as you age. NAD+ is vital for cells to function and repair. It supports brain health, muscle health and recovery, heart health, cellular energy and repair, and lifestyle stress management. Patented Tru Niagen is more efficient at raising NAD+ than other NAD+ precursors such as NMN, niacinamide, or niacin.
- TRU STORY: WITHOUT NAD, CELLS DIE - Our bodies naturally decrease in NAD+, with up to a 65% decline between ages 30-70. Effects of metabolic stress and time on your cells can accelerate aging, which leads to many health concerns. Everyone's body,

47. On Defendants' website, they consistently claim that the Products are "clinically proven" and "scientifically researched," both on the opening page and on the pages to purchase the Products, advertising to consumers that the Products are a health product supported by scientific consensus.[21]

/ / /

/ / /

/ / /

/ / /

[21] https://www.truniagen.com/products/tru-niagen-300mg (last visited June 12, 2026).




48. Defendants' marketing strategy is most pervasive on their social media and influencer campaigns. One search on Instagram or TikTok pulls several paid vertical-form videos of influencers discussing the Products and their "health benefits." In one TikTok video posted on March 23, 2026, an influencer discusses how famous health guru, Bryan Johnson, uses Defendants' Products to "get his NAD+ levels equal to that of a 16-year-old." That video was viewed over 170,000 times as of June 4, 2026.

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /







### D. Defendants' Misleading Claims Are Unsupported By Clinical Evidence

49. Defendants rely heavily on the claim that the Products were "clinically proven" to provide these health benefits. Consumers understand the terms "clinically proven" to mean that the Products' effectiveness is broadly supported by the scientific community and generally found in clinical results. Put simply, consumers rely on that term to mean that Defendants' claims are supported by reliable, scientific evidence in controlled studies, so they can trust that the Products will actually provide results.

50. However, the underlying clinical evidence on supplements that use NR to increase NAD+ levels has shown far less than clinically proven, conclusive results.

51. In fact, the National Advertising Division of the Better Business Bureau evaluated Defendants' claims after a challenge was brought by Reus Research LLC, another supplement brand. The National Advertising Division evaluated the claims

that the Products were "clinically proven to significantly increase NAD+ levels, and help maintain them with daily use," as well as a separate claim that the NAD+ levels rise within hours and show significant increase within two weeks.[22]

52. The National Advertising Division concluded that the clinical evidence Defendants used to make their claims did not support the broadly disseminated clinically proven, anti-aging and health benefits conveyed explicitly to consumers.

53. In reality, the active ingredient in the Products, NR, was found to only increase NAD+ levels under certain limited conditions. The National Advertising Division found that the outcomes of the studies referenced by Defendants for their claims varied greatly depending on several factors in each study, such as study design, populations, duration, endpoints, and conditions of use. These factors limited the extent to which there was evidence to support Defendants' broadly touted "clinically proven" claim.

54. The National Advertising Division further concluded that Defendants improperly linked increases in NAD+ biomarkers in certain studies to broad health benefits that the studies did not support. The National Advertising Division also clarified that claims framed at the cellular level, like Defendants' claims that the Products support cellular and organ health, and other functional health benefits – could reasonably convey to a consumer that the Products are meant to provide tangible, functional health benefits.

55. In other words, the National Advertising Division report makes clear that Defendants' marketing campaign that relies heavily on language like "clinically proven," "backed by science," and "cellular health," would lead any ordinary consumer to believe that a product is supported by a broad scientific consensus to provide real health benefits.

---

[22] https://bbbprograms.org/media/newsroom/decisions/niagen (last visited June 12, 2026).

56. Defendants have thus purposefully and deceptively used these terms on their labeling and advertising campaigns because these claims are not supported by a clinical or scientific consensus, and studies showing that the primary ingredient in Defendants' Products has increased NAD+ levels does not correlate to actual health benefits.

57. The National Advertising Division also concluded that Defendants' advertising conveyed false and misleading messages regarding the Products' effects on heart health, cognitive health, immune health, metabolism, anti-aging, vitality, exercise, muscle recovery, and cellular repair.

58. The National Advertising Division found that certain testimonials promoted by Defendants also conveyed unsupported messages regarding improvements in health or functional benefits from taking the Products.

59. The National Advertising Division review of Defendants' influencer marketing practices led the National Advertising Division to recommend that Defendants ensure any material connections between the influencers and Defendants were clearly and conspicuously disclosed in both audio and visual portions of the content, consistent with the FTC Endorsement Guides and National Advertising Division's guidance.

60. After the National Advertising Division's review, Defendants voluntarily agreed to discontinue certain challenged claims, like the Products' ability to improve reproductive health, sleep improvement, and even false "Made in USA" claims, although it is questionable whether they have complied. Indeed, as of June 5, 2026, claims that the Products improve reproductive health are still shown on Defendants' website at the purchase page for the Products, despite Defendants' agreement to discontinue those claims.[23]

[23] https://www.truniagen.com/products/tru-niagen-300mg (last visited June 15, 2026).

61. Still, Defendants appealed the National Advertising Division's decision to the National Advertising Review Board ("NARB").

62. On May 21, 2026, the NARB affirmed the National Advertising Division's decision and agreed that Defendants' cited studies did not support the claim that the Products were "clinically proven" to provide actual health benefits as conveyed to consumers. The NARB also determined that Defendants' advertising improperly conveyed that biomarker increases from taking the Products translated to real-world health and anti-aging benefits.

63. The NARB made clear that many of the claims made regarding the Products went well beyond cell-level mechanistic effects, and falsely promised functional health benefits that were not supported by the science cited by Defendants.

64. The NARB agreed with the National Advertising Division and recommended discontinuation or modification of claims related to various health benefits, including heart health, brain health, immune health, vitality, muscle recovery, energy, and cellular repair. Defendants stated they would comply with the NARB's recommendations.

65. Accordingly, Plaintiffs allege that Defendants knew or should have known that these claims were false or misleading. Regardless, Defendants intentionally used this language to convey to the reasonable consumer that the Products had been clinically shown to provide meaningful, actual health benefits.

66. Indeed, Defendants' Amazon listing described the Products as "A COMPLETE ANTI AGING SUPPLEMENT" supporting "brain health, muscle health and recovery, heart health, cellular energy and repair" — the precise health-benefit categories the NARB determined were unsupported — immediately following a "clinically proven" establishment claim, conveying to reasonable consumers that all such benefits had been clinically demonstrated.

### E. But For Defendants' Misrepresentations, Plaintiffs and Class Members Would Not Have Paid the Price Premium for the Products

67. Defendants' misrepresentations caused Plaintiffs and members of the proposed Classes to pay a price premium for the Products because they believed they were purchasing a specialty product supported by broad scientific consensus to increase NAD+ levels and provide various benefits, including cellular repair and anti-aging effects.

68. Plaintiffs paid for products marketed as being "clinically proven" to improve NAD+ levels and provide anti-aging and cellular-level health benefits.

69. Ordinary consumers would reasonably be misled by Defendants' claims. Defendants are a prominent brand in the NAD+ supplement market. Reasonable consumers reading Defendants' claims would believe that the Products' effectiveness is supported by substantiated scientific testing, and would provide functional health benefits.

70. Ordinary consumers are also not in the position to evaluate Defendants' health claims made about their Products and whether the Products actually meet the scientific and clinical claims made concerning NAD+ levels, cellular repair, anti-aging, and whether any health benefits are supported by substantive clinical consensus.

71. Thus, consumers reasonably relied on Defendants' claims made continuously and conspicuously in their marketing and advertising of the Products.

72. Had Defendants truthfully represented the Products, specifically that the Products were not "clinically proven" to provide the broad anti-aging and other health benefits conveyed by Defendants' labeling and advertising, Plaintiffs and members of the prospective Classes would not have purchased the Products, or at least would have purchased them for a much lower price.

73. Accordingly, Plaintiffs and other members of the Classes incurred economic damages equal to the entirety of the purchase price they paid for the Products.

## PLAINTIFFS' EXPERIENCES

### A. Plaintiff Caryn Hart

74. In May 2026, Plaintiff Caryn Hart purchased Defendants' Products in person at her local Sprouts Farmer Market location in Encinitas, California for $45 plus tax.

75. Plaintiff cares about her long-term health and consciously takes preventative measures to increase her wellness and longevity.

76. Before purchasing the Products for the first time, Plaintiff saw videos on social media posted by wellness influencers promoting Defendants' claims, which Defendants distribute to influencers for their promotional content, including but not limited to, that the Products were clinically proven to increase NAD+ levels and various health claims that the Products supported cellular health, anti-aging and longevity.

77. Plaintiff also reviewed the language on the labeling which stated that the Products which include Defendants' health claims, such as "age better."

78. Plaintiff relied on these claims when purchasing the Products and they were a substantial reason she purchased the Products.

79. Even though the Products were more expensive than generic dietary supplements, Plaintiff chose to pay a premium price based on the Products' representations as discussed above, including the claim that the Products were "clinically proven" to increase NAD+ levels.

80. After using the Products, Plaintiff felt none of the promoted health benefits, and ceased using the Products, as they did not provide the benefits claimed by Defendants.

81. Had Plaintiff known that the Products were not "clinically proven" to increase NAD+ levels, and were not proven to provide tangible health benefits, like cellular repair, anti-aging, heart health, and muscle health, among other claims, Plaintiff would not have purchased the Products, or at least would have paid substantially less.

### B. Plaintiff Clare Erslev

82. Plaintiff Clare Erslev purchased Defendants' Products from the Tru Niagen website multiple times in Silver Spring, Maryland, with the last purchase dated September 2, 2025. Plaintiff purchased the 300 mg 90 count bottle of the Products for $101.60 not including tax.

83. Before purchasing the Products, Plaintiff reviewed the language on the Tru Niagen website, including the claims that the Products are "clinically proven" to increase NAD+ levels by 50%.

84. Plaintiff relied on these claims when purchasing the Products, and they were a substantial reason why she chose to Purchase the Products.

85. Even though the Products were more expensive than generic dietary supplements, Plaintiff chose to pay a premium price based on Defendants' representations as discussed above, including the claim that the Products were "clinically proven" to increase NAD+ levels.

86. After using the Products, Plaintiff felt none of the promoted health benefits, and ceased using the Products, as they did not provide the benefits claimed by Defendants.

87. Had Plaintiff known that the Products were not "clinically proven" to increase NAD+ levels, and were not proven to provide tangible health benefits, like supporting cellular repair, anti-aging, heart health, and muscle health, among other claims, Plaintiff would not have purchased the Products, or at least would have paid substantially less.

**C. Plaintiff Anise Ivey**

88. Plaintiff Anise Ivey purchased the Products multiple times from Defendants' Amazon storefront while in Mesa, Arizona. She last purchased the Products in November 2025. Plaintiff purchased the Tru Niagen 300mg. 30 ct. from Amazon.com for $40.20.

89. When purchasing the Products on Defendants' Amazon storefront, Plaintiff viewed Defendants' claims that the Products were "clinically proven" to increase NAD+ levels with 2 weeks of daily use, and that the Products can provide actual health benefits, like supporting "brain health, muscle health and recovery, heart health, cellular energy and repair, and lifestyle stress management."

90. Plaintiff relied on Defendants' claims when she decided to Purchase the Products, and they were a substantial reason why she chose to purchase the Products.

91. Even though the Products were more expensive than generic dietary supplements, Plaintiff chose to pay a premium price based on Defendants' representations as discussed above, including the claim that the Products were "clinically proven" to increase NAD+ levels.

92. After using the Products, Plaintiff felt none of the promoted health benefits, and has ceased using the Products, as they did not provide the benefits claimed by Defendants.

93. Had Plaintiff known that the Products were not "clinically proven" to increase NAD+ levels, and were not proven to provide tangible health benefits, like supporting cellular repair, anti-aging, heart health, and muscle health, among other claims, Plaintiff would not have purchased the Product, or at least would have paid substantially less.

## CLASS ALLEGATIONS

94. Plaintiffs seek certification under Fed. R. Civ. P. 23 of the following class and/or subclasses:

All natural persons Nationwide who purchased

> Defendants' Tru Niagen products during the applicable statutory period (the "Class").
>
> All natural persons who purchased Defendants' Tru Niagen products while in California during the applicable statutory period (the "California Subclass").
>
> All natural persons who purchased Defendants' Tru Niagen products while in Maryland during the applicable statutory period. (the "Maryland Subclass").
>
> All natural persons who purchased Defendants' Tru Niagen products while in Arizona during the applicable statutory period. (the "Arizona Subclass").

95. Members of the classes and/or subclasses described are referred to as "Class Members" or members of the "Classes."

96. The following are excluded from the Classes: (1) any Judge presiding over this action and members of his or her family; (2) Defendants, Defendants' subsidiaries, parents, successors, predecessors, and any entity in which Defendants or its parent has a controlling interest (as well as current or former employees, officers, and directors); (3) persons who properly execute and file a timely request for exclusion from the Classes; (4) persons whose claims in this matter have been finally adjudicated on the merits or otherwise released; (5) Plaintiffs' counsel and Defendants' counsel; and (6) the legal representatives, successors, and assigns of any such excluded persons.

97. Certification of Plaintiffs' claims for class-wide treatment is appropriate because Plaintiffs can prove the elements of their claims on a class-wide basis using the same evidence as would be used to prove those elements in individual actions alleging the same claims.

98. **Numerosity – Federal Rule of Civil Procedure 23(a)(1).** The members of the Classes are so numerous that individual joinder of all Class Members is impracticable. On information and belief, Class Members number in the thousands to millions. The precise number or identification of members of the Classes is presently unknown to Plaintiffs but may be ascertained from Defendants' books and records. Class Members may be notified of the pendency of this action by recognized,

Court-approved notice dissemination methods, which may include U.S. mail, electronic mail, Internet postings, and/or published notice.

99. **Commonality and Predominance – Federal Rule of Civil Procedure 23(a)(2) and 23(b)(3).** Common questions of law and fact exist as to all members of the Classes, which predominate over any questions affecting individual members of the Classes. These common questions of law or fact include, but are not limited to, the following:

a. Whether Defendants' "clinically proven" and anti-aging claims were false and/or misleading;

b. Whether Defendants' representations regarding the Products included false and/or misleading statements and/or omissions;

c. Whether Defendants knowingly made false and misleading "clinically proven" and health-benefit claims concerning the Products;

d. Whether Defendants' representations were material;

e. Whether an objectively reasonable consumer would have been misled by Defendants' representations; and

f. Whether Defendants charged consumers a price premium because of their misrepresentations on the Products' labeling and advertising.

100. Defendants engaged in a common course of conduct giving rise to the legal rights sought to be enforced by Plaintiffs, on behalf of themselves and the other Class Members. Similar or identical statutory and common law violations, business practices, and injuries are involved. Individual questions, if any, pale by comparison, in both quality and quantity, to the numerous common questions that dominate this action.

101. **Typicality – Federal Rule of Civil Procedure 23(a)(3).** Plaintiffs' claims are typical of the claims of the other Class Members because, among other

things, all such claims arise out of the same wrongful course of conduct engaged in by Defendants in violation of law as complained of herein. Further, the damages of each Class Member were caused directly by Defendants' wrongful conduct in violation of the law as alleged herein.

102. **Adequacy of Representation – Federal Rule of Civil Procedure 23(a)(4).** Plaintiffs are adequate representatives of the Classes because they are members of the Classes and their interests do not conflict with the interests of the Class Members they seek to represent. Plaintiffs have also retained counsel competent and experienced in complex commercial and class action litigation. Plaintiffs and their counsel intend to prosecute this action vigorously for the benefit of all Class Members. Accordingly, the interests of the Class Members will be fairly and adequately protected by Plaintiffs and their counsel.

103. **Superiority – Federal Rule of Civil Procedure 23(b)(3).** A class action is superior to any other available means for the fair and efficient adjudication of this controversy, and no unusual difficulties are likely to be encountered in the management of this class action. The damages or other financial detriment suffered by Plaintiffs and the Class Members are relatively small compared to the burden and expense that would be required to individually litigate their claims against Defendants, so it would be impracticable for Class Members to individually seek redress for Defendants' wrongful conduct. Even if Class Members could afford individual litigation, the court system could not. Individualized litigation creates a potential for inconsistent or contradictory judgments and increases the delay and expense to all parties and the court system.

104. By contrast, the class action device presents far fewer management difficulties, and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court.

## CLAIMS FOR RELIEF

**COUNT I**
**Violations of the California Unfair Competition Law**
**Cal. Bus. & Prof. Code § 17200, *et seq.***
**(on behalf of the Class and/or the California Subclass)**

105. Plaintiffs incorporate by reference and re-allege all prior paragraphs of this complaint as though fully set forth therein.

106. Plaintiffs bring this claim on behalf of themselves and the Classes, or, in the alternative, Plaintiff Hart brings this claim on behalf of herself and the California Subclass.

107. Defendants' acts and practices constitute unlawful, unfair, and fraudulent business practices in violation of California's Unfair Competition Law Cal. Bus. & Prof. Code §§ 17200, *et seq.* ("UCL"). The application of the UCL to the putative Classes in this action is appropriate because Defendants' wrongful conduct alleged herein originated in California, including but not limited to Defendants' unfair, deceptive, and fraudulent marketing of the Products to the Classes emanating from Defendants' headquarters in Los Angeles, California, as well as Defendants' unfair, deceptive, and fraudulent marketing of the Products to the California Subclass in the State of California.

108. Defendants are each a "person" as defined by Cal. Bus & Prof. Code § 17201.

109. Defendants engaged in unlawful, fraudulent and/or "unfair" business practices in violation of the UCL by, among other things:

a. Misrepresenting material facts about the Products, including that they are "clinically proven" to provide actual anti-aging health benefits to consumers;

b. Misleading consumers to believe that the Products demonstrated actual health benefits through rigorous scientific testing, even though they do not;

c. Marketing and selling Products when they were not merchantable for the purposes they were advertised for;

d. Marketing and selling the Products while concealing material facts from Plaintiffs and Class Members regarding the abilities, features and attributes of the Products;

e. Concealing from Class Members that Defendants were in breach and intended to breach their contractual obligations as set forth in this complaint;

f. Concealing from Plaintiffs and Class Members that Defendants were in breach and intended to breach their warranty obligations as set forth in this complaint; and

g. Violating additional laws and regulations as set forth herein.

110. Defendants engaged in this conduct to gain an unfair commercial advantage over their competitors, seeking to avoid public knowledge of the true features (or lack thereof) of the Products to avoid damage to their sales or reputations. They withheld critical and material information from Plaintiffs and Class Members, competitors and marketplace – all to their unfair and competitive advantage.

111. Defendants' advertising and marketing of the Products was deceptive, unreasonable, and entirely unjustifiable, especially given that Defendants knew or should have known that their health claims made concerning the Products were not clinically or scientifically supported and would reasonably lead ordinary consumers to believe otherwise.

112. Defendants have engaged in "unlawful" business practices by violating multiple laws, including the Consumers Legal Remedies Act, Cal. Civ. Code §§ 1750, *et seq*. ("CLRA"), the California False Advertising Law, Cal. Bus. Prof. Code §§ 17500, *et seq*. ("FAL"), the Song-Beverly Consumer Warranty Act, Cal. Civ. Code §§ 1790, *et seq*. ("SBA"), and California and other state common law.

113. Defendants have also engaged in "fraudulent" business practices because they made false, deceptive, and misleading representations and omissions—all which emanated from California—regarding the Products' ability to provide actual anti-aging health benefits, among other benefits and that those claims were clinically proven. Given that Defendants knew or should have known that those health claims were not clinically or scientifically supported—and made these health claims the centerpiece of their marketing campaign—they knew that the misrepresentations and omissions were likely to mislead consumers into purchasing the Products because they are material to the average, ordinary, and reasonable consumer.

114. Defendants have also engaged in "unfair" business practices because the utility of their conduct as described in this Complaint is outweighed by the gravity of the consequences to Plaintiffs and Class Members and because Defendants' conduct as described in this Complaint is immoral, unethical, oppressive, unscrupulous or substantially injurious to Plaintiffs and Class Members, and violates established public policy including those underpinning the CLRA, FAL, SBA, California and other state common law.

115. Defendants' conduct and the harm it caused was not reasonably avoidable by Plaintiffs and the Class Members. Defendants knew or had reason to know that Plaintiffs and the Class Members could not have reasonably known that Defendants' health claims were not clinically or scientifically supported.

116. Had Plaintiffs and the Class Members known that Defendants' claims were unsupported, and that the Products could not actually provide the health benefits that Defendants represented them to achieve, they would not have purchased the Products, or at the very least, would have purchased them for a lower price.

117. As a direct and proximate result of Defendants' unfair, unlawful, and fraudulent acts and practices, Plaintiffs and Class Members were damaged and lost

money or property including from not receiving the benefit of their bargain in purchasing the Products.

118. Pursuant to Cal. Bus. & Prof. Code § 17203, Plaintiffs and Class Members seek all monetary and non-monetary relief allowed by law. In addition, Plaintiffs and Class Members seek an order: (a) requiring Defendants to restore to Plaintiffs and the Class Members any money acquired by means of the deceptive and unfair business practices, including restitution of all profits stemming from Defendants' unfair, unlawful, and fraudulent business practices; (b) awarding reasonable costs and attorneys' fees pursuant to Cal. Civ. Code § 1021.5; and (c) any other appropriate equitable relief.

**COUNT II**
**Violations of the California Consumers Legal Remedies Act,**
**(Cal. Civ. Code §§ 1750, *et seq.*)**
**(on behalf of the Class and/or the California Subclass)**

119. Plaintiffs incorporate by reference and re-allege all prior paragraphs of this complaint as though fully set forth herein.

120. Plaintiffs bring this claim on behalf of themselves and the Classes, or, in the alternative, the Plaintiff Hart brings this claim on behalf of herself and the California Subclass.

121. The Consumers Legal Remedies Act, Cal. Civ. Code §§ 1750, *et seq.* ("CLRA"), is a comprehensive statutory scheme that is to be liberally construed to protect consumers against unfair and deceptive business practices in connection with the conduct of businesses providing goods, property, or services to consumers primarily for personal, family, or household use.

122. In accordance with the liberal application and construction of the CLRA, application of the CLRA to the putative Classes in this action is appropriate because Defendants' wrongful conduct alleged herein originated in California, including but not limited to Defendants' unfair or deceptive marketing of the Products to the Classes emanating from Defendants' headquarters in Los Angeles,

California, as well as Defendants' unfair or deceptive marketing of the Products to the California Subclass in the State of California.

123. Plaintiffs and the Class Members are "consumers" who purchased "goods" in the form of the Products within the meaning of Cal. Civ. Code §§ 1761(a) & (d).

124. Defendants are each a "person" within the meaning of Cal. Civ. Code § 1761(c).

125. The CLRA, Cal. Civ. Code §1770(a)(5), (7), & (9) provide, in part, as follows:

> (a) The unfair methods of competition and unfair or deceptive acts or practices listed in this subdivision undertaken by any person in a transaction intended to result or that results in the sale or lease of goods or services to any consumer are unlawful:
>
> …
>
> (5) Representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits or quantities which they do not have . . .;
>
> …
>
> (7) Representing that goods or services are of a particular standard, quality, or grade, or that goods are of a particular style or model, if they are of another.
>
> …
>
> (9) Advertising goods or services with intent not to sell them as advertised.

126. Defendants violated the CLRA, section 1770(a)(5), *inter alia*, by representing that the Products have sponsorship, approval, characteristics, uses or benefits, which they do not have, and/or CLRA section 1770(a)(7) by representing that the Products are of a particular standard, quality, or grade, even though they are of another, and/or CLRA section 1700(a)(9) by advertising the Products with intent not to sell them as advertised. Such conduct includes, among other things:

a. Marketing and selling the Products as being "clinically proven" to provide actual anti-aging health benefits;

b. Marketing and selling the Products as having demonstrated actual health benefits through rigorous scientific testing, even though they do not;

c. Marketing and selling the Products when they were not merchantable for the purposes they were advertised for;

d. Marketing and selling the Products while concealing material facts from Plaintiffs and Class Members regarding the abilities, features, or attributes of the Products;

e. Concealing from Class Members that Defendants were in breach and intended to breach their contractual obligations as set forth in this complaint;

f. Concealing from Class Members that Defendants were in breach and intended to breach their warranty obligations as set forth in this complaint; and

g. Violating additional laws and regulations as set forth herein.

127. Concurrently with the filing of the instant Complaint, Plaintiffs are sending a CLRA notice of violation and demand letter to Defendants. Plaintiffs presently only seek injunctive relief for violations of the CLRA, but will amend their complaint to seek monetary relief from Defendants to provide actual, compensatory, statutory, and/or punitive damages should Defendants not adequately respond to the CLRA demand letter within the statutorily prescribed time.

## COUNT III
**Violation of the California False Advertising Law,**
**Cal. Bus. & Prof. Code §§ 17500, *et seq*.**
**(on behalf of the Class and/or the California Subclass)**

128. Plaintiffs incorporate by reference and re-allege all prior paragraphs of this complaint as though fully set forth herein.

129. Plaintiffs bring this claim on behalf of themselves and the Classes, or, in the alternative, Plaintiff Hart brings this claim on behalf of herself and the California Subclass.

130. Defendants' conduct alleged herein violates California's False Advertising Law, Cal. Bus. & Prof. Code §§ 17500, *et seq.* ("FAL"), which makes it unlawful for a business to make, disseminate, or cause to be made or disseminated to the public "any statement, concerning . . .personal property . . . which is untrue or misleading, and which is known, or which by the exercise of reasonable care should be known, to be untrue or misleading."

131. The Products are "personal property" as governed by Cal. Bus. & Prof. Code § 17500.

132. At all material times, Defendants' statements, marketing and advertising materials misrepresented or omitted material facts regarding the abilities, features, or attributes of the Products as set forth in this Complaint. Defendants disseminated statements, marketing, and advertising concerning the effectiveness and benefits of the Products that are unfair, untrue, deceptive, or misleading within the meaning of the FAL.

133. Defendants made, disseminated, or caused to be made or disseminated such public statements in numerous forums, including but not limited to Defendants' website and product pages, social media campaigns, influencer campaigns, and other publicly available media (whether print, video, audio, or other format) that republished such representations and omissions.

134. Defendants' acts and practices have deceived and/or are likely to continue to deceive Plaintiffs, members of the Classes, and the public. As set forth above, Defendants' claims are deceptive and misleading to reasonable consumers because an ordinary consumer would believe that Defendants' claims that the

Products were "clinically proven" to provide anti-aging benefits means that this claim is supported by clinical or scientific consensus when they are not. Defendants did not disclose any of this information to consumers.

135. In making and disseminating the statements alleged herein, Defendants knew or should have known their advertisements were deceptive misleading. Plaintiffs and Class members based their decisions to purchase the Products on Defendants' misrepresentations and omissions of material facts. Plaintiffs and Classes Members were injured in fact and lost money and property as a result.

136. Plaintiffs and Class Members seek all monetary and non-monetary relief allowed by law, including restitution of all profits stemming from Defendants' unfair, unlawful, and fraudulent business practices; declaratory relief; reasonable attorneys' fees and costs under California Code of Civil Procedure § 1021.5; injunctive relief; and other appropriate equitable relief.

## COUNT IV
## Violation of the California Song-Beverly Consumer Warranty Act, Cal. Civ. Code §§ 1790, *et seq.*

137. Plaintiffs incorporate by reference and re-allege all prior paragraphs of this complaint as though fully set forth herein.

138. Plaintiffs bring this claim on behalf of themselves and the Classes, or, in the alternative, the Plaintiff Hart brings this claim on behalf of herself and the California Subclass.

139. Defendants violated the Song-Beverly Consumer Warranty Act, Cal. Civ. Code §§ 1790, *et seq*. ("SBA"), by, among other things, violating the implied warranties of merchantability by knowingly selling the Products, which are unsuitable for their expected and advertised use in violation of sections 1791.1 and 1791.2, and were therefore not fit for the ordinary purpose for which the goods were intended to be sold.

140. Plaintiffs and Class Members have complied with all obligations under the warranty or otherwise have been excused from performance of said obligations as a result of Defendants' conduct described herein.

141. Plaintiffs seek restitution and damages as a result of Defendants' unlawful conduct, as well as attorneys' fees and costs of suit.

**COUNT V**
**Violation of the Maryland Consumer Protection Act**
**Md. Comm. Code §§ 13-301, *et seq.***
**(on behalf of the Maryland Subclass)**

142. Plaintiff incorporates by reference and re-allege all prior paragraphs of this complaint as though fully set forth therein.

143. Plaintiff Erslev ("Plaintiff" for purposes of this Count) brings this claim on behalf of herself and the Maryland Subclass.

144. Defendants are "persons" as defined by Md. Comm. Code § 13-101(h).

145. Defendants' conduct as alleged herein related to "sales," "offers for sale," or "bailment" as defined by Md. Comm. Code § 13-101(i) and § 13-303.

146. Maryland Subclass members are "consumers" as defined by Md. Comm. Code § 13-101(c).

147. Defendants advertise, offer, or sell "consumer goods" or "consumer services" as defined by Md. Comm. Code § 13-101(d).

148. Defendants advertised, offered, or sold goods or services in Maryland and engaged in trade or commerce directly or indirectly affecting the people of Maryland.

149. Defendants engaged in unfair and deceptive trade practices, in violation of Md. Comm. Code § 13-301, including:

a. False or misleading oral or written representations that have the capacity, tendency, or effect of deceiving or misleading consumers;

b. Representing that consumer goods or services have a characteristic that they do not have;

c. Representing that consumer goods or services are of a particular standard, quality or grade that they are not;

d. Failing to state a material fact where the failure deceives or tends to deceive;

e. Advertising or offering consumer goods or services without intent to sell, lease, or rent them as advertised or offered;

f. Deception, fraud, false pretense, false premise, misrepresentation, or knowing concealment, suppression, or omission of any material fact with the intent that a consumer rely on the same in connection with the promotion or sale of consumer goods or services or the subsequent performance with respect to an agreement, sale lease or rental.

150. Defendants engaged in these unfair and deceptive trade practices in connection with offering for sale or selling consumer goods or services or with respect to the extension of consumer credit, in violation of Md. Comm. Code § 13-303. Such conduct includes, among other things:

a. Misrepresenting material facts about the Products, including that they are "clinically proven" to provide actual anti-aging health benefits to consumers;

b. Misleading consumers to believe that the Products demonstrated actual health benefits through rigorous scientific testing, even though they do not;

c. Marketing and selling Products that are not merchantable for the purposes they were advertised for;

d. Marketing and selling the Products while concealing material facts from Plaintiff and Class Members regarding the abilities, features and attributes of the Products;

e. Concealing from Class Members that Defendants were in breach and intended to breach their contractual obligations as set forth in this complaint;

f. Concealing from Plaintiff and Class Members that Defendants were in breach and intended to breach their warranty obligations as set forth in this complaint; and

g. Violating additional laws and regulations as set forth herein.

151. Defendants' representations and omissions were material because they were likely to deceive reasonable consumers.

152. Defendants intended to mislead Plaintiff and Maryland Subclass members and induce them to rely on their misrepresentations and omissions.

153. Defendants misrepresented to Plaintiff and Maryland Subclass members the capabilities of the Products with regard to their ability to provide actual health benefits, and whether Defendants' claims of the Products' health benefits were clinically proven. Plaintiff and the Maryland Subclass members acted reasonably in relying on Defendants' misrepresentations and omissions, the truth of which they could not have discovered.

154. Defendants acted intentionally, knowingly, and maliciously to violate Maryland's Consumer Protection Act, and recklessly disregarded Plaintiff and Maryland Subclass members' rights. Defendants' knowledge that Defendants' health claims were unsupported put them on notice that the Products were not as they advertised.

155. As a direct and proximate result of Defendants' unfair and deceptive acts and practices, Plaintiff and the Maryland Subclass members have suffered and will continue to suffer injury, ascertainable losses of money or property, and

monetary and non-monetary damages, including from not receiving the benefit of their bargain in purchasing the Products.

156. Plaintiff and Maryland Subclass members seek all monetary and non-monetary relief allowed by law, including damages, disgorgement, and attorneys' fees and costs.

**COUNT VI**
**Violation of the Arizona Consumer Fraud Act**
**A.R.S. §§ 44-1521, *et seq.***
**(on behalf of The Arizona Subclass)**

157. Plaintiff incorporates by reference and re-allege all prior paragraphs of this complaint as though fully set forth therein.

158. Plaintiff Ivey ("Plaintiff" for purposes of this Count) brings this claim on behalf of herself and the Arizona Subclass.

159. Defendants are each a "person" as defined by A.R.S. § 44-1521(6).

160. Defendants advertised, offered, or sold goods or services in Arizona and engaged in trade or commerce directly or indirectly affecting the people of Arizona.

161. Defendants engaged in deceptive and unfair acts and practices, misrepresentation, and the concealment, suppression, and omission of material facts affecting the people of Arizona in connection with the sale and advertisement of "merchandise" (as defined in A.R.S. § 44-1521(5)) in violation of A.R.S. § 44-1522(A). Such conduct includes, among other things:

a. Misrepresenting material facts about the Products, including that they are "clinically proven" to provide actual anti-aging health benefits to consumers;

b. Misleading consumers to believe that the Products demonstrated actual health benefits through rigorous scientific testing, even though they do not;

c. Marketing and selling Products that are not merchantable for the purposes they were advertised for;

d. Marketing and selling the Products while concealing material facts from Plaintiffs and Class Members regarding the abilities, features and attributes of the Products;

e. Concealing from Class Members that Defendants were in breach and intended to breach their contractual obligations as set forth in this complaint;

f. Concealing from Plaintiffs and Class Members that Defendants were in breach and intended to breach their warranty obligations as set forth in this complaint; and

g. Violating additional laws and regulations as set forth herein.

162. Defendants' representations and omissions were material because they were likely to deceive reasonable consumers.

163. Defendants intended to mislead Plaintiff and the Arizona Subclass members of the true nature of the Products and their ability to increase NAD+ levels, and their ability to provide actual health benefits to consumers. Plaintiff and the Arizona Subclass members acted reasonably in relying on Defendants' misrepresentations and omissions, the truth of which they could not have discovered.

164. Defendants acted intentionally, knowingly, and maliciously to violate the Arizona Consumer Fraud Act, and recklessly disregarded Plaintiff and Arizona Subclass members' rights. Defendants' knowledge that the Products would not produce the advertised health benefits put it on notice that the Products were not as advertised.

165. As a direct and proximate result of Defendants' unfair and deceptive acts or practices, Plaintiff and Arizona Subclass members have suffered and will continue to suffer injury, ascertainable losses of money and property, and monetary and non-monetary damages, including from not receiving the benefit of the bargain of the Products.

166. Plaintiff and the Arizona Subclass members seek all monetary and non-monetary relief allowed by law, including compensatory damages; disgorgement; punitive damages; and reasonable attorneys' fees and costs.

**COUNT VII**
**Breach of Implied Warranty of Merchantability**
**(on behalf of the Classes and/or the Subclasses)**

167. Plaintiffs incorporate by reference and re-allege all prior paragraphs of this complaint as though fully set forth therein.

168. Plaintiffs bring this claim individually and on behalf of the Classes under California law, or, in the alternative, on behalf of the respective state Plaintiffs and subclasses under their respective state law.

169. Unless excluded or modified, a warranty that a good shall be merchantable is implied in a contract for their sale, if the seller is a merchant with respect to goods of that kind.

170. Defendants are merchants with respect to products such as the Products at issue.

171. In order to be merchantable, goods must conform to the promises or affirmations of fact made in the advertising of the Products.

172. Defendants breached the implied warranty of merchantability to Plaintiffs and Class Members in their representations that the Products were clinically proven to provide actual anti-aging benefits, among other various health benefits.

173. As a result of Defendants' misleading conduct, Plaintiffs and Class Members did not receive merchantable goods as impliedly warranted by Defendants.

174. Defendants did not exclude or modify the Products' implied warranty of merchantability.

175. As a proximate result of Defendants' breach of its implied warranty, Plaintiffs and Class Members incurred damages.

176. Plaintiffs and Class Members were damaged as a result of Defendants' failure to comply with their obligations under the implied warranty, since Plaintiffs

and Class Members paid for the Products that did not have the promised quality and nature, paid a premium for the Products, when they could have instead purchased other less expensive products, and Plaintiffs and Class Members lost the opportunity to purchase similar products that provided the capabilities advertised.

177. As a result of Defendants' breach of contract, Plaintiffs and the Classes Members have been damaged in an amount to be determined at trial.

**COUNT VIII**
**Breach of Express Warranty**
**(on behalf of the Classes and/or the Subclasses)**

178. Plaintiffs incorporate by reference and re-allege all prior paragraphs of this complaint as though fully set forth therein.

179. Plaintiffs bring this claim individually and on behalf of the Classes under California law, or, in the alternative, on behalf of the respective state Plaintiffs and subclasses under their respective state law.

180. Each of the Defendants is and was at all relevant times a merchant involved in the manufacturing, distributing, warranting, and/or selling of the Products.

181. Defendants provided Plaintiffs and Class Members with an express warranty. Plaintiffs and the Class Members formed contracts with Defendants at the time they purchased the Products. As alleged in detail above, Defendants expressly warranted that the Products were "clinically proven" and scientifically demonstrated to provide meaningful anti-aging and health benefits.

182. Defendants' affirmations of fact and promises included, among other things, representations that the Products were "clinically proven," scientifically validated, and capable of providing anti-aging, vitality, cognitive, cardiovascular, immune, cellular-energy, recovery, and related health benefits. Specifically, Defendants marketed the Products as "A COMPLETE ANTI AGING SUPPLEMENT" supporting "brain health, muscle health and recovery, heart health, cellular energy and repair." Defendants further used testimonials and influencer

advertising conveying real-world improvements in vitality, energy, recovery, cognition, and anti-aging benefits.

183. This product advertising constitutes express warranties, became part of the basis of the bargain, and is part of a standardized contract between Plaintiffs and the members of the Classes, on the one hand, and Defendants, on the other.

184. In fact, the Products did not conform to Defendants' affirmations and promises because the challenged claims were false and misleading.

185. Plaintiffs and the Class Members have complied with all obligations under the warranty or otherwise have been excused from performance of said obligations as a result of Defendants' conduct described herein. Plaintiffs and the Class Members were not required to notify Defendants of the breach because it would have been futile.

186. As a direct and proximate cause of Defendants' breach, Plaintiffs and Class Members bought Products they otherwise would not have, overpaid for the Products, did not receive the benefit of their bargain, and Defendants have not offered an adequate remedy.

187. Plaintiffs and Class Members seek all monetary and non-monetary relief allowed by law, including damages, incidental and consequential damages, declaratory relief, and any other relief that is just and proper.

## COUNT IX
**Unjust Enrichment**
**(on behalf of the Classes)**

188. Plaintiffs hereby incorporate by reference the allegations contained in this Complaint.

189. Plaintiffs bring this claim individually and on behalf of the Classes against Defendants under the laws of California and states with materially similar laws.

190. Plaintiffs and Class Members paid Defendants for, as advertised by Defendants, Products that were clinically proven and scientifically demonstrated to provide meaningful anti-aging and health benefits.

191. In exchange, Defendants provided Plaintiffs and Class Members with Products that did not and could not meet Plaintiffs' and Class Members' reasonable expectations created by Defendants' marketing, labelling, and other representations.

192. As alleged in detail above, Defendants knowingly and voluntarily accepted and retained benefits from Plaintiffs and the Classes through the purchase of the Products under inequitable circumstances.

193. Defendants either knew or should have known that the payments rendered by Plaintiffs and the Classes were given and received with the expectation that the Products were clinically proven to demonstrate actual health benefits.

194. It would be inequitable for Defendants to retain the benefits of those payments under the circumstances.

## PRAYER FOR RELIEF

Plaintiffs, individually, and on behalf of all other members of the Classes, respectfully request that the Court enter judgment in their favor and against Defendants as follows:

A. For an order certifying the Classes under Rule 23 of the Federal Rules of Civil Procedure and naming Plaintiffs as representative of the Classes, and Plaintiffs' attorneys as Class Counsel to represent the Class members;

B. For an order declaring that Defendants' conduct violates the statutes and laws referenced herein;

C. For an order finding in favor of Plaintiffs and the Classes on all counts asserted herein;

D. For compensatory, statutory, and punitive damages in amounts to be determined by the Court and/or jury;

E. For injunctive relief enjoining the illegal acts detailed herein;

F. For prejudgment interest on all amounts awarded;

G. For an order of restitution and all other forms of equitable monetary relief;

H. For an order awarding Plaintiffs and the Classes their reasonable attorneys' fees and expenses and costs of suit.

**<u>JURY TRIAL DEMANDED</u>**

Plaintiffs demand a trial by jury on all claims so triable.

Respectfully submitted,

**KAPLAN FOX & KILSHEIMER LLP**

DATED: June 18, 2026

By: <u>/s/ *Justin B. Farar*</u>
Justin B. Farar

Justin B. Farar (SBN 211556)
12400 Wilshire Boulevard, Suite 910
Los Angeles, CA 90025
Telephone: 310-614-7260
Facsimile: 310-614-7260
Email: *jfarar@kaplanfox.com*

**KAPLAN FOX & KILSHEIMER LLP**
Laurence D. King (SBN 206423)
Matthew B. George (SBN 239322)
Blair E. Reed (SBN 316791)
Sophia V. Pintar (SBN 367193)
1999 Harrison Street, Suite 1501
Oakland, CA 94612
Telephone: 415-772-4700
Facsimile: 415-772-4707
Email: *lking@kaplanfox.com*
*mgeorge@kaplanfox.com*
*breed@kaplanfox.com*
*spintar@kaplanfox.com*

*Attorneys for Plaintiffs Caryn Hart, Clare Erslev, Anise Ivey, and the Proposed Classes*